## PRITCHETT v. HORNBUCKLE.

Lumpkin, J.—The evidence, though entirely circumstantial and not absolutely conclusive against the defendant, was sufficient to warrant the verdict for the plaintiff rendered in the magistrate's court; and this court, therefore, will not reverse a judgment of the superior court refusing to sustain a certiorari brought to set the verdict aside on the ground that it was unsupported by the evidence.          Judgment affirmed.

August 24, 1896.

Certiorari.          Before Judge Milner.          Bartow superior court.          December 7, 1895.

This was a suit for triple damages under section 1445 of the code, for killing a sow belonging to the plaintiff. The sole question made is, whether the verdict in her favor is sufficiently supported, the evidence to connect defendant with the killing being circumstantial. He farmed on land south of a wagon road and east of a creek which runs north and south and is crossed by the road running east and west. Plaintiff lived on a road leading from said wagon road toward the Shelman place. The sow had some large shoats, and they ran during the day about the ford of the creek where the wagon road crosses it. One night the shoats came home and the sow did not come. The next day Hornbuckle and E. B. Holcombe went to hunt for her, and found her dead in a ditch on the Shelman place, in a field cultivated by Forrester, about half a mile down the creek and north of the wagon road, on the east side of the

creek.    They first saw her tracks where she came out of
the creek a quarter of a mile or more north of the wagon
road.    They saw where she had laid down on some cane,
and there saw blood and flies.    From there they followed
the tracks a quarter of a mile down the creek in Forrester's
field to where they found her dead.    She had been shot, and
Holcombe took a number of shot from her.    They found
no tracks leading down the creek from the wagon road to
where they first saw she had laid on the cane, which was
a little over a quarter of a mile down the creek and north
of the wagon road.    Hornbuckle then went to defendant
and asked him if he did not shoot and kill the sow, and he
denied it.    He was asked if he had not shot his gun the
day before, and he said he had, claiming that he had shot
at a hawk.    He was asked what kind of shot he used, and
from whom he bought them; and said, he did not know the
number of the shot, and bought shot sometimes from
Puckett and Hammond at Stilesboro, and sometimes at
Cartersville.    Hornbuckle asked him to go to his house
and show his shot; and he said, he did not have time, as he
was on his way to his work.    Hornbuckle and Forrester
examined the ground between defendant's garden and the
creek, above the foot-log up to an old road leading from
defendant's stable down to the creek, which road was used
by him in watering his stock.    They found a good deal of
blood scattered in this road, and saw blood in one place
between the road and the creek, about five or six feet from
the creek.    Where this blood was found were hog tracks
leading from the road toward the creek.    Upon being
questioned about this, defendant said his mule became sick
with colic and he bled it freely in the mouth.    He had
frequently done this.    He told Hornbuckle to go and ex-
amine the mule, the bridle and the stable, and see whether
or not he was telling the truth.    Hornbuckle did not make
the examination, though he was near the stable.    Forrester
did not think a mule could have gone to the spot where

they found blood about half way between the old road and the creek, from which spot hog tracks led toward the creek, as he had to stoop to get in there. This spot was about twenty-five or thirty feet from the road. The blood and tracks were about forty or fifty yards above and south of the foot-log. Forrester did not kill the hog. Dock Holcombe had a crop of corn on the east side of the creek, south of Forrester's crop and north of the wagon road. Wilson Glenn testified, that the sow and pigs were at his house on the morning of the day she was said to have been shot, and he made his boy Sam drive them down to the ford of the creek early that morning. He lived about a quarter of a mile from the creek, on the other side of it from defendant. Before that time the sow had broken into Glenn's crib and eaten a good deal of his corn. He lived north of the wagon road, but had a crop south of it. He went to the creek a short time after his boy drove the hogs there, and saw the pigs at the ford, but did not see the sow. Sam Glenn testified, that he drove the sow and pigs to the ford of the creek, and when they got there the sow went under the foot-log and went around beyond defendant's garden, but the pigs did not follow. He then went back home, and to school. E. B. Holcombe testified, that he heard a gun fire shortly before he last saw the sow. From the report, the gun was fired in the direction and near defendant's house. Witness did not wound, kill or bruise her. Defendant told him, the same day the hog was shot, that Arthur Davis learned him how to stop hogs from bothering him. He said he generally gave them the cholera, and they went, and nobody knew where. Forrester cultivated the east side of the creek, and Hammond the west side, where witness first discovered the tracks of the hog coming out of the creek a quarter of a mile below where the wagon road crosses the creek. Witness cultivated the land on the west side of the creek, and his son F. E. Holcombe cultivated the land on the east side, between where he first saw

the hog track and the wagon road. Hammond cultivated the land on the other side of the creek. These lands were planted in corn and cotton. A. F. Holcombe testified: The last time I saw the sow, she was lying down by the fence about 100 yards from our house. I heard a gun fire shortly before I last saw the sow. From the sound of the gun, it was right above the foot-log up the creek; it was fired near defendant's house; it was right above his house. I saw the smoke; never saw the person who fired the gun at the time it fired. Immediately after it fired I saw a hog. It was right at the foot-log when I first saw it. It went right down to a spring box below defendant's house, and came out of the creek there. When I first saw the sow she was close to where I heard the gun fire. It was on land occupied by defendant. I saw him immediately after the firing; he was going into his house; he had a gun on his shoulder. When the gun fired I was about 200 yards from the wagon road; we were below the ford where the wagon road crosses the creek. The hog was right at the foot-log when I first saw it after I heard the gun fire. It jumped into the creek, on the opposite of the creek from me, up at the water-gate above the wagon road crossing. It walked out of the creek at the spring on the opposite side of the creek from me. It went down to the other fence, rooted out a place and lay down, after it came out of the creek at the spring. It lay down at the fence across the road below the spring and on the opposite side of the creek from where I was. I never saw it any more after that. When I first saw it, it was about 225 yards from me. The closest it got to me was about 100 yards; this was when it lay down. I did swear on former trials, that the last time I saw the hog was when it jumped into the creek above the wagon road and went out of the creek near the spring-house, and then down across the wagon road to the fence enclosing the field, and then lay down.

Defendant testified, denying that he shot, killed or in

23

any way injured the sow, or that he ever saw her in his enclosure, etc.    The value of the animal was proved.

*J. B. Conyers,* for plaintiff in error.

*A. W. Fite* and *A. S. Johnson,* contra.